IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARK TURNER,**                                                Case 5:14 CV 799

      Plaintiff,

      v.                                                                  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                         MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Mark Turner filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consent to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on September 30, 2010, alleging an onset date of October 1, 2006.[1] (Tr. 242-43). Plaintiff applied for benefits due to panic attacks, depression and hypertension. (Tr. 165). His claim was denied initially (Tr. 201) and upon reconsideration (Tr. 210). Plaintiff requested a hearing before an administrative law judge ("ALJ") on November 30, 2011. (Tr. 216). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on September 13, 2012, after which the ALJ found Plaintiff not disabled. (Tr. 89-

---

1. At the time of the hearing, Plaintiff amended his alleged onset date to September 4, 2010. (Tr. 263).

105, 115). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on April 13, 2014. (Doc. 1).

**FACTUAL BACKGROUND**

Plaintiff generally challenges only the ALJ's conclusions regarding his mental limitations (Doc. 15) and therefore waives any claims about the determinations of his physical limitations. *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Accordingly, the undersigned addresses only the record evidence pertaining to Plaintiff's arguments.

### *Personal Background and Testimony*

Plaintiff was born on November 5, 1962 (Tr. 242) and was 49 years old on December 31, 2011, his date last insured ("DLI") (Tr. 94). He has completed the ninth grade. (Tr. 138). Plaintiff had a driver's license but did not use it. (Tr. 138-39). He has prior work history as a chemical compounder, general laborer, and delivery driver. (Tr. 133-38).

At the time of the hearing, Plaintiff lived with his wife in an apartment. (Tr. 123). Plaintiff's wife was also on disability for a chronic illness, but he only provided inconsequential care to her. (Tr. 123). The majority of her care was performed by his two adult children, who came by the house on alternating days. (Tr. 123-24). Plaintiff was capable of paying bills, counting change, and handling a savings account. (Tr. 294). He only socialized with his wife and son because other people made him feel unsafe. (Tr. 293-94).

Occasionally, Plaintiff cooked simple meals but his wife did most of the cooking. (Tr. 124).  Plaintiff did not do laundry or household chores because his back hurt too much if he did more than one room. (Tr. 124). In a normal day, Plaintiff watched TV, sat around, and talked

2

with his wife. (Tr. 128). He also took a nap every day, which helped relieve his back pain. (Tr. 128). Plaintiff slept poorly at night, maybe sleeping three to four hours at time before waking; after which he had trouble getting back to sleep. (Tr. 129). He stated racing thoughts, thoughts of death, and worrying about his wife made it difficult to sleep. (Tr. 291).

He performed his own personal grooming and self-care such as bathing, showering, shaving, and getting dressed; but he did not do these things when he was depressed. (Tr. 125). Plaintiff testified the last time he had one of these episodes of depression was about a month before the hearing and it lasted about two weeks. (Tr. 125). These episodes occurred about every other month and could last between two days and two weeks. (Tr. 126). During these times, Plaintiff stayed in bed, stared at the wall, and cried. (Tr. 125). When he is depressed, Plaintiff stated he could not concentrate, felt helpless and hopeless. (Tr. 301). He took Abilify for his depression and it seemed to help somewhat. (Tr. 131-32).

### *Relevant Medical Evidence*

Plaintiff was seen at Portage Path Behavioral Health from 2008 until April 2010, where he was diagnosed with major depressive disorder, recurrent, moderate. (Tr. 353).

In October 2010, Plaintiff reported depression, hopelessness, helplessness, fatigue, and panic attacks during an intake interview at Coleman Psychiatry. (Tr. 399). He admitted to fleeting suicidal thoughts but had no plans to carry them through. (Tr. 399). At the time he was homeless, but he planned to move in with a friend soon, although he stated he was unable to trust others. (Tr. 399). Plaintiff said his family relationships were poor or non-existent except for his wife and son. (Tr. 400-01). He was diagnosed with major depressive disorder, single episode,

mild, panic disorder without agoraphobia, and assigned a Global Assessment Functioning ("GAF") score of 34.[2] (Tr. 415).

On November 3, 2010, Plaintiff saw Susan Barker, CNS, at Coleman Psychiatry. (Tr. 417). At this time, he and his wife were homeless and he reported feeling helpless, hopeless, irritable, and anxious. (Tr. 417). Plaintiff also reported a good response to medication although he continued to have symptoms of anxiety and hopelessness. (Tr. 417). In a mental status evaluation, Ms. Barker noted he was well-groomed, cooperative, had average eye contact, clear speech, full affect, logical thought process, and good insight/judgment. (Tr. 418-19). She noted "[c]lient [is] overall satisfied, hopeful for further improvement." (Tr. 421). Ms. Barker diagnosed Plaintiff with generalized anxiety disorder; major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; social phobia; alcohol dependence in remission; and possible posttraumatic stress disorder. (Tr. 419).

At a follow-up session with Ms. Barker on February 2, 2011, Plaintiff reported he had a good response to the medication saying his depression and sleep had improved. (Tr. 422). He was now able to enjoy activities, was only "somewhat" worried, and could cope with stressors. (Tr. 422). Ms. Barker's mental status evaluation showed largely the same observations as before. (Tr. 423-24). She assigned him a GAF score of 50.[3] (Tr. 425).

_____

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school. *Id.*

3. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.* at 34.

In April 2011, Plaintiff again saw Ms. Barker and said he continued to have a good response to the medication. (Tr. 428). He had fewer panic attacks, his depression and sleep had improved, he worried less about his wife, and was able to cope with stressors. (Tr. 428). Ms. Barker noted Plaintiff had no cognitive impairments, adequate insight/judgment, and a logical thought process. (Tr. 429-30). She assigned him a GAF score of 50. (Tr. 430).

On July 22, 2011, Plaintiff reported increased depression, isolating himself at home, insomnia, nightmares, anxiety, irritability, anhedonia, and low energy. (Tr. 458). Ms. Barker's mental status evaluations remained largely unchanged and his GAF score remained at 50. (Tr. 459-61). At the same time, Ms. Barker filled out a mental RFC form for Plaintiff. (Tr. 442-43). She noted he would be fair to good at following work rules, using judgment, dealing with the public, interacting with supervisors, and working in coordination with others. (Tr. 442). But he would be poor at maintaining concentration for extended periods, maintaining regular attendance, and dealing with stress. (Tr. 442). She also concluded Plaintiff was fair to good in all areas of intellectual functioning. (Tr. 443). Lastly, she found he would be fair to very good at making personal and social adjustments with the exception of his inability to leave home on his own. (Tr. 443).

In October 2011, Plaintiff reported improvement in his mood following an increase in medication. (Tr. 455). He stated he was getting out more with family, was "keeping busy", was more comfortable in public, and more social. (Tr. 455). Ms. Barker assigned him a GAF score of 60. [4] She again saw Plaintiff on December 16, 2011. (Tr. 450). Plaintiff stated he was doing alright but was still having trouble sleeping. (Tr. 450). He said his depression, while not as bad

---

4. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

as it used to be, was still significant. (Tr. 450). Plaintiff denied any panic attacks but continued to have generalized anxiety at night. (Tr. 450). Ms. Barker found him to be calm, pleasant, dysthymic, less ruminative but with catastrophic thoughts but his GAF score remained 60. (Tr. 451-53).

Plaintiff returned to see Ms. Barker in January 2012. (Tr. 444). He reported his depression was moderate, he had low motivation, moderate anhedonia, and low mood. (Tr. 444). He stated his wife was not doing well and he was caring for her "24/7" which was causing him to worry. (Tr. 444). Ms. Barker's mental status evaluation reflected largely the same observations as the previous appointments. (Tr. 445-46). She again assigned Plaintiff a GAF score of 60. (Tr. 447).

In March 2012, Ms. Barker filled out another mental RFC for Plaintiff. (Tr. 491-92). She reported Plaintiff had improved or stayed the same in all but one category in making occupational adjustments, and in fact would now be very good at following work rules. (Tr. 491). The only categories in which Plaintiff would be poor was completing a work week and dealing with the public, a decrease from fair in her former evaluation. (Tr. 491). Furthermore, Ms. Barker reported Plaintiff ranged from fair to very good in all categories of intellectual functioning and making personal and social adjustments. (Tr. 492).

*Consultative Examination*

On February 15, 2011, Plaintiff was seen by consultative examiner Michael Harvan, Ph.D. (Tr. 367). At this appointment, Plaintiff was disheveled but cooperative. (Tr. 363). When asked if he knew why he was there Plaintiff said, "[a]s far as I'm concerned I'm disabled. I can't work. I will take it to court, whatever it takes." Dr. Harvan reported normal conversation, relevant responses, goal-oriented thoughts although Plaintiff did tend to ramble, normal affect,

and eye contact 65% of the time. (Tr. 363). Plaintiff complained of constant depression, racing thoughts, constant guilty feelings, low energy levels, and anhedonia. (Tr. 364). He denied suicidal thoughts but said if his wife was not there he is not sure what he would do. (Tr. 364).

Dr. Harvan observed no motor manifestations of anxiety but Plaintiff reported panic attacks two to three times a week which resulted in shaking, rapid heartbeat, and freezing up. (Tr. 364). He further stated he had a preoccupation with dying or "stuff being wrong with [him]." (Tr. 364). Dr. Harvan noted Plaintiff was oriented to person, place, time, and situation but had poor short term memory. (Tr. 364-65). He also noted Plaintiff had slight difficulty in focusing attention and concentrating but was capable of "follow[ing] simple and more complex directions." (Tr. 365). Dr. Harvan estimated Plaintiff had intellectual functioning in the low average range and assigned him a GAF score of 50. (Tr. 365-66). He diagnosed Plaintiff with mood disorder, not otherwise specified, and avoidant personality disorder. (Tr. 366). Dr. Harvan concluded Plaintiff was moderately impaired in his ability to: understand and follow instructions; maintain attention to perform simple or multi-step repetitive tasks; and to withstand the stress and pressures of work. (Tr. 366-67). He also found he was markedly impaired in his ability to relate to others. (Tr. 367).

*State Agency Examiners*

State agency medical consultant Tonnie Hoyle, Psy.D., reviewed Plaintiff's medical file on April 19, 2011 and concluded he had mild restrictions in daily living; moderate difficulties in social functioning and maintaining concentration, persistence, and pace; and no repeated episodes of decompensation. (Tr. 171). In support of her assessment, Dr. Hoyle noted Plaintiff was able to prepare meals, do dishes, sweep, and shop in stores. (Tr. 173). But she also commented he was forgetful and did not get along well with people or handle stress or change

well. (Tr. 173). In the mental residual functional capacity ("RFC"), Dr. Hoyle concluded Plaintiff had no memory limitations, was not significantly limited in concentration or persistence but should only perform tasks in a static environment, was limited to brief and superficial contact with others due to anxiety and social interaction limitations, and could perform simple and some complex tasks. (Tr. 175-76).

Upon reconsideration Mel Zwissler, Ph.D., reviewed Plaintiff's medical file on August 28, 2011 and concurred with the above findings of Dr. Hoyle. (Tr. 186-92).

### ALJ Decision

In December 2012, the ALJ found Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, obesity, gout, bilateral thumb trigger finger, major depressive disorder, panic disorder, depression – not otherwise specified, mood disorder – not otherwise specified, avoidant personality disorder, and anxiety; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 94-97). The ALJ then found Plaintiff had the RFC to perform light work except that Plaintiff may frequently balance, stoop, kneel, crouch, or crawl, and occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (Tr. 97). Plaintiff could frequently, but not continually, engage in handling and fingering, and was limited to the performance of simple, routine, repetitive tasks, which could be learned in 30 days or less. (Tr. 97). The environment must remain static and be low stress, precluding any work with high production quotas or any that required more than superficial and limited interaction with co-workers or the public. (Tr. 97).

Based on the VE testimony, the ALJ found Plaintiff could perform work as a cleaner, merchandise marker, or power screwdriver operator; and thus was not disabled. (Tr. 104).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which

substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

In his single assignment of error, Plaintiff argues the ALJ erred because she failed to give proper weight to the opinions of Ms. Barker and Dr. Harvan when determining Plaintiff's mental RFC. (Doc. 15, at 1). The Court will begin with a discussion of Ms. Barker's opinion and the weight assigned, followed by an analysis of Dr. Harvan's opinion.

### *"Other Source" Opinion of Susan Barker*

Plaintiff alleges the ALJ failed to give proper consideration to the "other source" evidence provided by Susan Barker, CNS.  (Doc. 15, at 10-16). As a Clinical Nurse Specialist, Ms. Barker is classified as an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1).

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

The ALJ considered Ms. Barker's July 2011 report and concluded that while she was not an acceptable medical source, her opinion was entitled to "some weight". (Tr. 102). The ALJ appropriately analyzed this opinion and noted that at the time the opinion was given, Ms. Barker had only seen Plaintiff three times; a treatment relationship which was not long enough to entitle

Ms. Barker's opinion to any greater weight. *See Helm v Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011); *see also Marrero v. Comm'r of Soc. Sec.*, 2012 WL 7767583, at *10 (N.D. Ohio) (finding an ALJ can limit "other source" opinion weights even when the "other source" provides a longitudinal picture of Plaintiff's condition). The ALJ also specifically noted Ms. Barker's opinion was not consistent with her own treatment records, which did not demonstrate Plaintiff had any impairment in attention or concentration. (Tr. 102, 418-19, 423-24, 429-30). Even though the ALJ found Ms. Barker's opinion somewhat insupportable, her RFC determination was consistent with the restrictions Ms. Barker described, notably Plaintiff was restricted to performing simple, routine tasks in a static, low stress work environment. (Tr. 97).

Further, to the extent Plaintiff is attempting to assign error to the ALJ's treatment of Ms. Barker's March 2012 opinion, he is incorrect. To qualify for DIB, Plaintiff must have been under a disability as of the date his insured status expired on December 30, 2011. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). The ALJ noted the March 2012 opinion was given after the DLI and rather than support a claim for disability, it noted improvement in Plaintiff's condition. (Tr. 102). The ALJ appropriately gave no weight to Ms. Barker's opinion rendered after the DLI because it has "little probative value" in proving the disability existed during the relevant period.  *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004).

The ALJ was not required to perform an exhaustive analysis of the "other source" opinion especially when the ALJ identified certain factors to discredit her opinion. *See Brewer,* 2012 WL 262632, at *10. The ALJ appropriately considered the "other source" opinion, and did not err by refusing to accept it as the basis for her mental RFC determination.

***The ALJ Appropriately Weighed Dr. Harvan's Opinion***

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

When evaluating a medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), but this is not so if a non-treating or non-examining source is involved. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murry v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *4 (finding "[n]otably, the procedural 'good reasons' requirement does not apply to non-treating physicians.").

Here, the ALJ accorded some weight to the opinion of consultative examiner Dr. Harvan. (Tr. 102). Contrary, to Plaintiff's assertion, the ALJ did evaluate the § 404.1527 factors in her decision, for example she noted Dr. Harvan had only seen Plaintiff one time and that his conclusions were not consistent with the record as a whole, specifically, the ALJ questioned whether Plaintiff had marked limitations in relating to others. (Tr. 102). She found the record evidence showed Plaintiff was "somewhat more amenable to social interaction" than Dr. Harvan

opined, citing his cooperative and calm demeanor with Ms. Barker and Dr. Harvan and the fact he was moving in with a friend at the time. (Tr. 102, 363, 399, 418, 423, 429, 451, 455, 459).

Thus, while not required to, the ALJ provided adequate reasoning − the length of the relationship and inconsistency − as to why she limited the weight given to Dr. Harvan's opinion. Furthermore, the RFC determination is consistent with the restrictions noted by Dr. Harvan in that it limits Plaintiff to only superficial interaction with co-workers and completion of simple and routine tasks. (Tr. 97, 363-67). Even if the Court were to construe the evidence as Plaintiff contends, substantial evidence exists to support the findings made by the ALJ and thus the Court will not overturn them. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB is supported by substantial evidence, and therefore the Commissioner's decision is affirmed.


    s/James R. Knepp II
United States Magistrate Judge

14